## BROWNELL, ATTORNEY GENERAL, SUCCESSOR TO THE ALIEN PROPERTY CUSTODIAN, *v.* SINGER.

NO. 401.

Argued March 8, 1954.—Decided April 5, 1954.

*James D. Hill* argued the cause for petitioner in No. 401. With him on the brief were *Robert L. Stern,* then Acting Solicitor General, *Assistant Attorney General Townsend, George B. Searls* and *Irwin A. Seibel.*

*Edward Feldman* and *Daniel Gersen* submitted on brief for petitioner in No. 402.

*Albert R. Connelly* argued the cause for respondent. With him on the brief were *George S. Collins* and *George M. Billings.*

PER CURIAM.

Reversed. *Zittman* v. *McGrath,* 341 U. S. 471.

THE CHIEF JUSTICE did not participate in the consideration or decision of this case.

MR. JUSTICE JACKSON, with whom MR. JUSTICE FRANKFURTER and MR. JUSTICE DOUGLAS join, dissenting.

The Court's one-word decision reverses concurring judgments of three highly respected courts—the Court of Appeals of New York, the Appellate Division of the

Supreme Court, First Department, and the Supreme Court, Special Term, New York County. It cites a single case, the implication being that the cited authority settled the question so fully and plainly that a contrary result could have been reached by the three lower courts only by failure to read or heed it. I think this Court owes those courts and the legal profession something more than a reference to an inapplicable decision. The facts of this case present novel questions that this Court should face and on which it should render a reasoned decision.

The Yokohama Specie Bank established its New York agency, pursuant to the State's permission, under a statute which provided that the bank's assets in the State should be subject to the claims of creditors arising out of transactions with the New York agency in preference to other claims. On December 8, 1941, when war was declared with Japan, this agency was in the possession of the United States Treasury, which was supervising freezing controls over Japanese nationals. The agency was immediately surrendered to the New York Superintendent of Banks for liquidation under state law. This respondent's claim was established thereafter as entitled to the preferences of the New York law but was payable only after a federal license therefor, and that position was confirmed by this Court. *Lyon* v. *Singer*, 339 U. S. 841.

In 1942, the President, pursuant to statutory authority, created the Office of Alien Property Custodian. As to property in the process of administration under judicial supervision, the Custodian was authorized to seize only that "which is payable or deliverable to, or claimed by, a designated enemy country or national thereof." This fund, earmarked for payment to an American creditor, is not within that description. No other authority for demanding its turnover can be found.

In September of 1942, the Custodian asserted power of supervision over the liquidation of the New York agency but advised the Superintendent of Banks to continue his liquidation of the business and property in New York. He requested the Superintendent to advise him of all claims which he intended to accept and to notify him when he had liquidated assets sufficient to pay and had paid all accepted and established claims and expenses of liquidation in order that the Custodian might take such action "at that time with respect to the assets remaining in your hands" as he might deem necessary. Thereafter, as various claims were allowed payable to preferred creditors who were enemy nationals, the Custodian issued vesting orders seizing such funds as were set aside for their payment. Of course, he cannot seize this claim on such a basis, for the claimant is not an enemy alien.

On February 15, 1943, the Custodian issued vesting order No. 915. By it, he only purported to vest in himself the excess proceeds of the liquidation remaining after the payment of creditors having claims accepted or established in accordance with the Banking Law of New York. Since such excess funds, under that law, were payable to the Japanese bank, this was obviously a proper vesting. But the limitation of the vesting order to such excess was no accident or oversight. In annual reports to the President and Congress, the Custodian repeatedly stated, in substance, that rights of creditors preferred by state laws would be respected, and only the excess vested.

The turnover order now sustained by the Court is quite contrary to this policy and was not issued until September 5, 1950, over five years after the cessation of hostilities with Japan and over eight years after the task of administration was left to the Superintendent of Banks.

The fund of over a half-million dollars which the Attorney General as successor to the Alien Property Cus-

todian now demands be paid over to him is a fund specifically held and earmarked by the Superintendent of Banks for the payment of the claim which we have previously upheld as entitled to a preference under New York law. *Lyon* v. *Singer, supra.*

All funds in the hands of the Superintendent in excess of allowed or established claims have been demanded by the Custodian, and the New York Supreme Court has authorized their payment, as under New York law such excess is payable to the Japanese bank. The New York courts, however, have refused to allow the Superintendent to turn over the funds allocated to the satisfaction of the judgment in favor of respondent and affirmed by us, to be paid if and when licensed by the Attorney General.

*Zittman* v. *McGrath,* 341 U. S. 471, cannot serve as a supporting authority for this decision. In *Zittman* the Custodian demanded transfer of a credit from a debtor bank which had no interest in the credit except that of a stakeholder. Here the Custodian would seize a fund from an officer of the State of New York who is administering it pursuant to his statutory duty and under the supervision of the Supreme Court of that State. In *Zittman* the claims adverse to the Custodian rested on an assertion of private rights and in no other way involving the public interest. Here there is a clash between two public interests. New York, through its Superintendent of Banks, took possession of the Yokohama Bank assets for administration pursuant to its own public policy of protecting creditors of institutions allowed to do business in the State of New York. After a lapse of many years, the Attorney General now would seize it from him to apply a different public policy—that of the Federal Government.

Moreover, in *Zittman* the vesting order specifically vested debts owed to a foreign national by a New York

debtor bank and debts evidenced by instruments endorsed by the foreign national and held by a Federal Reserve Bank. Those debts constituted the precise funds sought by the litigant. In this case, the vesting order purported to vest only such excess proceeds as remained after payment of established claims, and respondent shows that his is such a claim. His position, that the funds he seeks were never vested by the Custodian, is not analogous to that of the petitioner in *Zittman*.

Some effort was made on argument to reconsider whether this claim is entitled to a preference under the Banking Law of New York. The claim arose out of a foreign exchange transaction. Prior to the war, the Standard Vacuum Oil Company was delivering oil to Japanese purchasers who paid in yen. It is not questioned that such sales were in accordance with the national policy of the United States at that time. Standard entered into an agreement with the Yokohama Bank under which it sold the yen to the bank in Japan and was to receive credit in dollars in New York. This manner of remitting funds was conventional and was the function which the New York branch of a foreign bank would be expected to facilitate. The New York courts held that creditors created by such a foreign exchange transaction, including respondent, were among those whom the New York statutes sought to protect out of the New York assets. In the *Singer* case, *supra*, we approved that holding. Unless every principle of *res judicata* is to be disregarded by this Court, it is bound by its holding that this is a preferred claim under the New York Banking Law.

It was intimated in argument that the purpose of seizure of this fund is to defeat the preference for this claim in the interest of other creditors outside of New York who will not be paid in full. This would mean a distribution of the New York assets at odds with the New York Bank-

ing Law.   But it is apparent that a large number of New York creditors have been paid in full from the New York assets, and just why this creditor, who stands on an equality with them, should be deprived of his claim of preference while the others retain theirs is hard to understand.

This Court has been rather insistent that state courts disclose the reasoning behind their judgments.*   I think the Court should reciprocate when faced with issues as serious and as doubtful as those raised in this case.

---

*E. g., Minnesota v. National Tea Co., 309 U. S. 551; Loftus v. Illinois, 334 U. S. 804; Chicago v. Willett Co., 341 U. S. 913.